**Ray HAYS, et al., Plaintiffs,**

v.

**STATE OF LOUISIANA,
et al., Defendants.**

**Civ. A. No. 92–1522.**

United States District Court,
W.D. Louisiana,
Shreveport Division.

July 29, 1994.

Jay B. McCallum, Robun & McCallum, Farmerville, LA, Thomas G. Zentner, Jr., Theus Grisham, Davis & Leigh, Monroe, LA, Paul L. Hurd, Monroe, LA, Robert Richard Gasaway, Kirkland & Ellis, Washington, DC,

for Ray Hays, Edward L. Adams, Susan Shaw Singleton, Gary Stokley.

Roy A. Mongrue, Jr., Atty. General's Office, Baton Rouge, LA, for State of Louisiana, Edwin W. Edwards, Samuel B. Nunez, Jr., John A. Alario, Jr., W. Fox McKeithen, Jerry M. Fowler.

Sydney B. Nelson, Nelson & Hammons, Shreveport, LA, for Richard H. Baker, Clyde C. Holloway.

William P. Quigley, Loyola Law School Clinic, New Orleans, LA, for Bernadine St. Cyr, Calvin Wilkerson, Ed Jones, Donald Thibodeax, Patrick Fontenot, Hazel Freeman, Zelma Wyche, Janice Frazier, Ralph Wilson.

A. Leon Higginbotham, Jr., New York City, for Congressional Black Caucus.

Benjamin Jones, Jones & Smith, Monroe, LA, Robert B. McDuff, Jackson, MS, J. Gerald Hebert, Lawyers Cmte for Civil Rights Under Law, Washington, DC, for Louisiana Legislative Black Caucus.

William J. Flanagan, U.S. Attys. Office, Shreveport, LA, Colleen M. Kane, Matthew G. Olsen, U.S. Dept. of Justice, Washington, DC, for U.S.

Before WIENER, Circuit Judge, SHAW, Chief District Judge, and WALTER, District Judge.

By order dated June 27, 1994, this case was remanded from the United States Supreme Court for further proceedings, — U.S. ——, 114 S.Ct. 2731, 129 L.Ed.2d 853. For the following reasons, Act 1 of the Second Extraordinary Session of the 1994 Louisiana Legislature is null and void. The State of Louisiana is hereby enjoined from holding any future Congressional elections based upon the redistricting scheme embodied by Act 1.

## I

### STATE OF THE CASE

Ray Hays, Edward Adams, Susan Singleton, and Gary Stokely ("Plaintiffs") brought this suit in state court in August 1992 challenging Act 42 of 1992. The case was removed to this Court by the State of Louisi-

ana. After one trial and an evidentiary hearing, we struck down Act 42 as an impermissible racial gerrymander violative of Plaintiffs' equal protection rights. The State of Louisiana et al. ("Defendants") pursued their appeal directly to the Supreme Court. Meanwhile, during an extraordinary session, the Louisiana Legislature enacted Act 1, repealing Act 42 and creating a new Congressional redistricting scheme. Plaintiffs filed supplemental pleadings seeking to amend their complaint. The amended pleadings challenged Act 1 and sought injunctive relief. As the case was on appeal to the Supreme Court, the motions were returned unsigned for lack of jurisdiction. On June 27, 1994, the Supreme Court vacated our judgment of December 29, 1993, —— U.S. ——, 114 S.Ct. 2731, 129 L.Ed.2d 853; remanded the case to this Court "for further consideration in light of Act 1 of the Second Extraordinary Session of the 1994 Louisiana Legislature and the parties' filings in this Court concerning Act 1." Consistent with that order, this Court permitted the previously filed amended complaint and a two-day trial was held to determine the constitutionality of Act 1.

## II

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

In the interest of brevity, we reiterate and adopt by reference our December 28, 1993 opinion. Our conclusions regarding Plaintiffs' standing to bring an equal protection challenge are adopted as well. With that in mind, we make the following findings:

### A

#### "THE ACT (1) SPEAKS FOR ITSELF"

The districting map of Louisiana, created under Act 1, reflects a racial gerrymander. Specifically the bizarre and irregular shape of District Four raises the inference that the Louisiana Legislature classified its citizens along racial lines and segregated them into voting districts accordingly. The district cuts across historical and cultural divides, splits twelve of its fifteen parishes and divides four of the seven major cities of the State. The statistical evidence showing

the racial composition of the districts further supports the finding that District Four is "so extremely irregular on its face that it rationally can be viewed only as an effort to segregate the races for purposes of voting." *Shaw v. Reno,* —— U.S. ——, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993).[1] Plaintiffs, by submitting the new map with their supplemental pleadings, stated a claim upon which relief can be granted under the Equal Protection Clause. We ordered the State of Louisiana and Defendant–Intervenor United States to begin the trial by rebutting this inference.

Defendants offered the testimony of two State Senators, the State Senate's assistant secretary, a geographer, and a sociologist in an effort to explain the shape of the district on other than impermissible racial grounds. Those persons involved directly with the formation of Act 1 acknowledged that the creation of a second majority-minority district was the specific intent of the Legislature. Two race-neutral explanations were submitted by the defense. First, the geographer opined that as District Four followed the Red River valley, it endowed all its residents with a commonality of interest. Second, the various witnesses asserted that District Four was inspired by "the old Eighth" district thereby satisfying the concept of "traditional" districting principles.

The starting point, following the 1990 census, was to redistrict for seven congressional districts, instead of eight, Louisiana having lost one member of Congress. Next, the State sought to comply with the Constitutional requirement of one man—one vote. In this case, each district should contain, as closely as practicable, 603,853 citizens. The State's evidence clearly shows what happened next: Misinterpreting our opinion of December 1993 as approving a racially gerrymandered district if it contained no more than 55% minority registered voters; and remaining convinced that the Department of Justice would not pre-clear any plan that did not contain two majority/minority districts, the Legislature embarked on an endeavor to comply with those demands and still secure adoption. These were the only inflexible features given to the cartographer/demographer in charge of generating the seven districts.

After reviewing the evidence, we find that Act 1 can only be explained credibly as the product of race-conscious decisionmaking. The Senators themselves admitted that race played a large if not dominant role in the map as it is now drawn. The Red River valley theory is clearly a *post hoc* rationalization similar to the Mississippi River theory offered to support Act 42 and equally unbelievable. The State did not imitate the "old Eighth" for tradition's sake.[2] The "old Eighth," certainly bizarre, before *Shaw* and never challenged, was crafted for the purpose of ensuring the reelection of Congressman Gillis Long. New District Four was drafted with the specific intent of ensuring a second majority-minority Congressional district. The State's purported reliance on District Four's similarity to the "old Eighth" is mere pretext. Although the witnesses highlighted other factors that carved the contours of the awkward district, the *fundamental factor driving Act 1 was race.*

### B

#### ACT 1 IS SUBJECT TO STRICT SCRUTINY

■ Race-conscious redistricting, while not always unconstitutional, is always subject to strict scrutiny. This conclusion has troubled legislators, scholars, litigators, and judges alike. T. Alexander Aleinikoff, Samuel Issacharoff, *Race and Redistricting: Drawing Constitutional Lines After Shaw v. Reno,* 92 Mich.L.Rev. 588, 602 ("Aleinikoff"). The problem is caused by the incomplete constitutional status of affirmative action plans in the voting rights realm. In *United Jewish Organization v. Carey,* 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977), the Supreme Court applied a more deferential standard to what the plurality deemed "benign" measures. One year later, the Court decided *Regents of the University of Califor-*

---

1. The State now concedes that Act 42 was bizarre. In our opinion of December 28, 1993, we called for major surgery. Act 1 is at best a cosmetic makeover.

2. In fact, District Four incorporates the "old Eighth" only in part. It shoves the top further north into Shreveport, further south into Baton Rouge and shortens it to the east.

*nia v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) following the theory that "the right not to be injured on the basis of one's skin color was a personal right secured by the Constitution, and the asserted lack of an invidious purpose could not be a sufficient reason for reducing the level of judicial scrutiny applied to measures that disadvantaged persons on the basis of race." Aleinikoff, 92 Mich.L.Rev. at 592. Eleven years later, *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) confirmed the notion that, since *Bakke,* the scrutiny applied under the Fourteenth Amendment Equal Protection Clause will not vary based on the race of the preferred group. 488 U.S. at 493, 109 S.Ct. at 721–22. *Shaw* is consistent with the more recent equal protection precedents, focusing on individual rights as opposed to *UJO*'s group-based approach. Aleinikoff, 92 Mich.L.Rev. at 600. By not overruling UJO, *Shaw v. Reno* can be read to ratify "the earlier group-based decisions which focus on whether electoral schemes 'dilute' the voting strength of protected minorities [while making clear] that the fact of non-dilution does not immunize districting plans from constitutional challenge." *Id.*

"A racial classification, despite purported motivation, is presumptively invalid and can be upheld only upon an extraordinary justification." *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 272, 99 S.Ct. 2282, 2293, 60 L.Ed.2d 870 (1979). Therefore, such legislation must be narrowly tailored to further a compelling governmental interest if it is to pass constitutional muster.

### C

#### COMPELLING GOVERNMENTAL INTEREST

Defendants have proved no compelling governmental interest in distinguishing among citizens of Louisiana because of their race. Defendants contend that incumbency

politics, the Voting Rights Act, and remedying past legal and social or continuing social discrimination justified the racial segregation of voters. We disagree.

■ We note at the outset that incumbency politics cannot justify racial classifications. Adhering to federal anti-discrimination laws and remedying past or continuing discrimination could constitute compelling governmental interests if the State could "demonstrate a strong basis in evidence for its conclusion that remedial action was necessary." *Croson,* 488 U.S. at 510, 109 S.Ct. at 730. Such a basis may be drawn from judicial, legislative, or administrative findings of constitutional or statutory violations.

#### 1

#### Voting Rights Act

The State Legislature believed that the Voting Rights Act compelled the creation of a second majority-minority district.[3] A careful review of those statutes and the caselaw interpreting them reveals that the State's belief was misplaced.

■ Under Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c, the State has an affirmative duty to avoid retrogression or enactment of a plan that has the purpose or effect of denying or abridging the right to vote because of race or color. Neither the State nor the Department of Justice offered any evidence suggesting that failure to create a second majority-minority district would either be a retrogression of minority strength or have an illegal purpose or effect. Not surprisingly, we can find no support for such a claim either. Section 5 cannot be read to compel the results of Act 1.

■ A Voting Rights Act Section 2 violation occurs when, under the totality of the circumstances, a State's apportionment scheme has the effect of diminishing or abridging the voting strength of a protected class. In *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), the

---

**3.** This belief was encouraged, if not demanded, by the Department of Justice, under an actual or implied threat of withholding Section 5 pre-clearance. The shield became a sword. Whether the Attorney General had the right to withhold pre-clearance may be open to question, but she

certainly had the power, and the threat, whether issued by her or some middle level bureaucrat, was a matter of real concern to the State. Litigation in the District of Columbia, and everywhere else is expensive. We hold, however, that a real concern is not a compelling one.

Supreme Court enumerated three conditions to a Section 2 "dilution" claim: (1) a numerous and compact minority, that is (2) politically cohesive, and (3) subject to majority bloc voting usually defeating the minority's preferred candidate. 478 U.S. at 50–51, 106 S.Ct. at 2766. The evidence convincingly proves that the State cannot clear the first *Gingles* hurdle.[4] Accordingly, Section 2 cannot serve as a compelling justification for Act 1. Certainly the Voting Rights Act would *permit* the creation of a second majority-minority district, but the fact that such a district is permitted does not *compel* its creation. *Shaw* demands that we distinguish between what the Voting Rights Act requires and what it permits. —— U.S. at ——, 113 S.Ct. at 2830. As for any arguments that Section 2 compels maximization of minority voting strength, the Supreme Court recently held:

> (R)eading Section 2 to define dilution as any failure to maximize tends to obscure the very object of the statute and to run counter to its textually stated purpose. One may suspect vote dilution from political famine, but one is not entitled to suspect (much less infer) dilution from mere failure to guarantee a political feast ... Failure to maximize cannot be the measure of Section 2.

*Johnson v. DeGrady,* —— U.S. ——, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994). Hence, the State did not have a basis in law or fact to believe that the Voting Rights Act *required* the creation of two majority-minority districts.[5]

### 2

### Remediation of Past or Present Discrimination

■ Defendants elicited testimony that the sordid history of unconstitutional treatment of black citizens in Louisiana prompted the State to tinker with district lines in order to ensure minority control at the polls. Using the disease as a cure is a dangerous antidote, one that must be absolutely warranted before being administered. Ironically, one witness contended that the days of "white" and "colored" water fountains and bus seats justify distinct "white" and "African–American" congressional districts. What the defense failed to establish is where the Civil Rights Act of 1964 and the Voting Rights Act of 1965 have failed to accomplish what the State now sets out to do. Without concrete evidence of the lingering effects of past discrimination or continuing legal prejudice in voting laws and procedures, coupled with specific remedies, we cannot agree that the re-segregation of Louisiana by racially configured voting districts is warranted.[6] *Croson* and *Bakke* dictate this result.

Finally, we refuse to accept the explanation that citizen response to issues such as education, crime and health care is driven by skin pigmentation. Legitimation of that notion would herald the demise of equal protection.

### III

### THE COURT'S PLAN

Our strong preference is to leave to the Legislature the task of drawing election districts. We reluctantly set our hands to the task, considering the lateness of the hour, the dismal history of the Legislature in two previous attempts, foot-dragging by the defendants in the appeals and the risk that Louisiana might be without Congressional repre-

---

**4.** Despite a minority population of approximately 30%, demographic distribution is simply too diffuse (See Gov't Exhibit 2) to generate a majority voting age population in any district outside of the Orleans Parish region. The State's own expert confirmed that Louisiana's minority population is simply not sufficiently concentrated to meet *Gingles* minimum requirements.

**5.** A strong basis under *Gingles* does exist, however, to warrant the creation of a majority-minority district in the Orleans Parish region, where one

has existed since 1983. *See Major v. Treen,* 574 F.Supp. 325 (E.D.La.1983).

**6.** We also note, that, accepting *arguendo* the remediation argument as compelling, the defendants utterly failed to demonstrate how gerrymandering could remedy the problems asserted as compelling interests. That is exactly the problem with a sweeping remedy to an amorphous concept. Without properly defining the compelling interest, it is impossible for the State to narrowly tailor any plan.

sentation in January 1995. The districts that we drew split only 6 parishes of the sixty-four, followed traditional lines, only one town of approximately 3000 was divided, and the plan met all Constitutional one man—one vote requirements. It did ignore all political considerations. And, instructed by *Gingles,* we did not carve districts along race lines, except in District 2, where the Constitution and fairness requires us to consider it.[7]

## IV

### CONCLUSION

The Equal Protection Clause demands strict scrutiny of government use of race as a dividing line. This is an individual right in addition to any group-based protections that the Amendment affords. When voting districts are carefully planned like racial wards, an *individual* injury occurs. All citizens are stigmatized by the notion that their "interests" can be defined by race or will be represented adequately only if a member of their racial "group" holds a particular office. To reinforce such racial notions by *operation of law* seems to fly in the face of Justice Thurgood Marshall's expressed hope in his argument in *Cooper v. Aaron* that we "learn to live together with fellow citizens, and above all to learn to obey the law."

I find a contrary position strangely at odds with the desires so eloquently voiced, not so long ago, in Shreveport, in Jackson, in Selma, in countless towns across the South, at schools and lunch counters, at voter registrar's offices. They stood there, black and white, certain in the knowledge that the Dream was coming; determined that no threat, no spittle, no blow, no gun, no noose, no *law* could separate us because of the color of our skin. To say now: "Separate!" "Divide!" "Segregate!" is to negate their sacrifice, mock their dream, deny that self-evident truth that all men are created equal and that no government may deny them the equal protection of its laws.

The validity of equal protection and the systemic legitimacy of our electoral process are threatened when a State sculpts voting districts along race lines. As here, when the State cannot, or has not, offered and supported an extraordinary justification for these questionable measures, the race-conscious enactments must fall.

WALTER, District Judge, WIENER, Circuit Judge, and SHAW, Chief District Judge, concurring, with SHAW, Chief District Judge, concurring specially with whom WIENER, Circuit Judge, concurs.

SHAW, Chief District Judge, concurring:

I concur in the able opinion of the majority. It is an honest effort to provide a suitable plan for Congressional districts in Louisiana within the restraints of the Constitution. I would, however, like to add a few words which may be somewhat repetitive but which address matters in our December 28, 1993 ruling which we have adopted by reference as well as additional findings supported by the evidence. Applying the same constitutional analysis to Act 1 has led us to a similar conclusion.

Again, this Court is called upon to answer the same question, "Does a state have the *right* to create a second racial majority-minority Congressional district by racial gerrymandering?"

The United States Supreme Court has answered that question for this Court in *Shaw v. Reno,*[1] "Yes, but only if the plan is narrowly tailored to further a compelling state interest."

For the following reasons, this Court finds that the Congressional Redistricting Plan embodied in Act 1 and District 4, in particular, is the product of racial gerrymandering and is not narrowly tailored to further any compelling governmental interests. The plaintiffs' right to equal protection as guaranteed by the United States Constitution is violated by this redistricting plan, and as such, the plan is null and void.

### Racial Gerrymandering

As stated in our previous opinion, racial gerrymandering is defined as the intentional

---

7. *See Major v. Treen, note 5 supra.*

1. 508 U.S. ——, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993).

segregation of voters on the basis of race. This Court is called upon to first determine whether the redistricting plan is the result of racial gerrymandering.

At trial, the witnesses for the State readily admitted that the purpose of District 4 was to create a second black majority district. The testimony of the state legislators and the State Senate Assistant Secretary confirmed that the district lines were driven by the fact that the black population in the State of Louisiana was sufficiently dispersed through the State that it was impossible to create a second majority black district without skewing the lines into a long irregular shape, as demonstrated by District 4 of the plan.

The districting plan embodied in Act 1 is highly irregular in its shape. Though it may be less bizarre than the plan created in Act 42, the physiognomy of District 4 still strongly suggests that the Legislature engaged in racial gerrymandering in creating the district. Looking at District 4 on a map of Louisiana, it appears as if someone knocked over an inkwell somewhere around Waskom, Texas, spilling ink aimlessly across the map of Louisiana. There is simply nothing regular about the contours of District 4.

This Court acknowledges that the appearance or beauty of a district is irrelevant to a constitutional analysis; however, the irregularity in shape of a district is suspect and can indicate racial gerrymandering.

Although *Shaw* discusses the concept of bizarre or irregular shape as a means of demonstrating or inferring racial gerrymandering, the high court in no way indicated that shape alone was a determining factor in a finding of racial gerrymandering.

This Court finds, aside from the irregularity of the shape of this district, the evidence at trial clearly supported a finding of racial gerrymandering. The Louisiana Legislature abandoned traditional districting principles to arrive at a Plan which created two majority black voting districts. Act 1, like Act 42, completely disregards the traditional districting principles of compactness, respect for political subdivisions, and respect for commonality of interests.

### a. Compactness

District 4, under Act 1, begins in Caddo Parish, and includes the Parishes of DeSoto, Red River, Sabine, and Natchitoches, all located in clearly defined North Louisiana, and ends in Ascension Parish, after cutting through the French region of Louisiana called "Acadiana," which includes Lafayette, St. Martin, St. Landry, and Evangeline Parishes. The district is approximately 250 miles long, and meanders through 15 parishes, making it considerably longer than any other district in the State. District 4 cuts up four major population centers of Louisiana, including Shreveport, Alexandria, Lafayette, and Baton Rouge, in its efforts to capture sufficient pockets of African–American voters, paying no respect to parish lines.[2] The district points fingers out into Caddo, Rapides, and Lafayette Parishes, while taking small bites out of St. Martin and Iberville Parishes. A district that stretches over as much territory, touching so many media and population centers, cannot be said to be compact.

### b. Respect for Political Subdivisions

Although Act 1 is an improvement from Act 42, the state legislature continues to disregard the parish lines in fashioning a plan to create a second minority district.

In the creation of District 4, the State found it necessary to fragment twelve of the fifteen parishes comprising District 4, splitting sixteen parishes statewide under the plan. District 4 is made up of pieces and parts of twelve parishes and splits four of the State's largest cities, outside of New Orleans—Shreveport, Baton Rouge, Lafayette, and Alexandria. Clearly, Act 1 has no respect for Louisiana's political subdivisions.

### c. Commonality of Interests

To say that District 4 comprises voters with common interests violates all traditional

---

**2.** This court notes that District 4 covers, not only four major population centers of Louisiana, but includes four separate and major media centers of this state. Congressional candidates would be required to spend substantial amounts of money and time covering the voters in four major areas of the state.

north-south, ethno-religious, economic and historical distinctions in Louisiana which created this State's diverse personality.

District 4 includes North Louisiana English–Scotch–Irish, mainline Protestants, South Louisiana French–Spanish–German Roman Catholics, traditional rural black Protestants, and Creoles. The district encompasses North, Central, and South Louisiana, each of which has its own unique identity, interests, culture, and history. The agricultural regions of District 4 include cotton, soybean, rice, sugar cane, and timber. Such diverse agricultural constituency have few common interests. We continue to question how one Congressional representative could adequately represent the varying interests of residents in such far-flung areas of the State.

A district which disregards commonality of interests and stretches across the State in a haphazard manner without regard to political subdivisions can only be explained as the result of racial gerrymandering.

### Justification for Defendant's Plan

The State attempted to put forth a race-neutral explanation for its plan by the use of a geographer who testified that District 4 was drawn along the Red River Valley demonstrating a commonality of interest. The State failed in its burden of proof to show that the Red River Valley region in the State of Louisiana demonstrated a commonality of interests.

Secondly, the State offered as support for its plan, that District 4 of the plan was modeled after the old eighth district in Louisiana which was created for and represented by Congressman Gillis Long.

This Court is not swayed by the assertion that the tradition of the past regarding the old eighth district is binding on this Court, due to the fact that the old eighth district was never challenged on constitutionality by any court in the United States. This Court is not called upon to determine the constitutionality of the old eighth district, and does not rely on the fact that such a district existed in Louisiana. What was done by the Louisiana Legislature in the old eighth has no application to this case before this Court,

and cannot be used as a comparable for the plan before this Court.

Accordingly, this Court finds that the only explanation of the State's Redistricting Plan was racial gerrymandering. The State intentionally segregated voters into Congressional districts on the basis of race, in order to intentionally create a second black majority voting district.

### Narrowly Tailored

A racially gerrymandered plan is subject to strict scrutiny, and as such it violates the Equal Protection Clause of the Fourteenth Amendment unless it is narrowly tailored to further a compelling governmental interest.

### Compelling Governmental Interest

Again, the State advances two possible compelling state interests to justify their racial gerrymandering: (1) compliance with the Voting Rights Act, and (2) remedying the effects of past discrimination.

### a. Compliance with the Voting Rights Act

Section 5 of the Voting Rights Act provides that a state has an affirmative duty to avoid retrogression or to avoid enactment of a plan that has the purpose or effect of denying or abridging the right to vote on account of race.

The defendants established that the Louisiana Legislature was operating under the belief that a second majority-black district was mandated by the Department of Justice to avoid retrogression, and obtain preclearance. Without commenting further regarding the role of the Department of Justice in affecting the plan enacted in Act 1, this Court finds no evidence to support a finding that a second majority-black district is required by Section 5 of the Voting Rights Act, to avoid retrogression. Prior to the census, Louisiana's Congressional delegation had only one black representative out of eight congressmen. Certainly, one congressman out of seven cannot constitute retrogression. Section 5 of the Voting Rights Act does not constitute a compelling governmental interest in this case.

Additionally, Section 2 of the Voting Rights Act prohibits a plan that has the effect of diminishing or abridging the voting strength of a protected class. However, this claim must fall in the face of the Supreme Court's ruling in *Thornburg v. Gingles*.[3]

This Court finds that Section 2 of the Voting Rights Act is not implicated by this plan. Although the Voting Rights Act would permit a second minority district, such a district is not compelled by the Act.

### b. Remedy Past Discrimination

The State advanced, as justification for its racially gerrymandered district, the belief that the creation of a second minority district in Louisiana is mandated to remedy the past discrimination which has existed in Louisiana.

This Court struggled with the concept of how to define "past discrimination" in Louisiana. Certainly, the history of Louisiana, as of most states in the deep South with respect to its treatment of blacks, is indelibly imprinted in our memories. This State, having inflicted great atrocities against minorities, has made great strides in remedying past discrimination, being ever vigilant of its current existence in the attitudes of many of its residents today. Louisiana, in the sense of its history, will always have a history of past discrimination. However, this Court must determine whether this State has a history of past legal discrimination in the voting laws and procedures which compels it to make reparations and remediation.

The Civil Rights Act of 1964 and the Voting Rights Act of 1965 have mandated the elimination of obstacles to minority participation at the polls. Since those turbulent times in Louisiana, and through the efforts of many black and white leaders in this State, we have seen the elimination of poll taxes, literacy tests, and violence to reduce or prohibit African–American participation in our elections process. Louisiana has minority representation in nearly every level of government, in almost every area of the State. Speaking only in the sense of the voting rights of minorities in Louisiana, this Court finds that there exist no significant obstacles for minorities in this State to participate in the elections process which have not been remedied by the Civil Rights Act of 1964 and the Voting Rights Act of 1965. Accordingly, the concept of remedying past discrimination is not a compelling governmental interest in the recent history of Louisiana in the area of voting rights.

This Court acknowledges the great benefits that are derived by an increase in minority representation in government, not only for those who are represented but also to the process of government itself. Given the opportunity to serve, minorities have shown that they perform admirably. A greater number of African–American leaders in the government process not only provide positive role models for all black citizens, but their efforts in government will insure that the legal obstacles to minority advancement in all areas of life will be eliminated. However, to disregard the rights of all citizens of the State of Louisiana would violate the Equal Protection Clause of the United States Constitution, and such a plan would do further violence to the ultimate goal of a colorblind system.

Although we found that the evidence presented at the hearing did not support the contention that the Legislature was operating pursuant to a compelling state interest, even if there had been satisfactory evidence at trial that there is a compelling state interest in creating a second majority-minority Congressional district, the plan embodied by Act 1 was not narrowly tailored to effect that interest. The fact that outside of the Orleans Parish area, the minority black population is relatively dispersed throughout the rest of the State, elicited the question of whether it was even possible to develop a districting plan that creates a second majority-minority district *and* is narrowly tailored, in the sense that the plan in total does not unduly burden the rights of third parties.

### The Court Imposed Plan

This Court, with the assistance and guidance of our appointed special master, devised

---

**3.** 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).

a Congressional Districting Plan. This plan was created from a computer program which included the demographics of the State of Louisiana. This Court started with the goal of creating seven Congressional districts, remaining true to the "one man, one vote" requirement, and the constraints of *Shaw* and *Gingles*.

After considering every combination available, this Court reached the conclusion that the diffused population of black voters in Louisiana, outside of District 2, makes it impossible to draw a Congressional plan which contains two minority-majority districts and passes constitutional muster. Act 1 clearly does not.

### Conclusion

While this Court finds that the creation of a second minority-majority district in Louisiana is permissive and advantageous, we do not find it compelling, under the constraints of the Constitution.

This Court applauds the Louisiana Legislature in its efforts to create a second minority district; however, such efforts run aground of the Constitution and the dictates of *Shaw v. Reno*.