**Ray HAYS, et al., Plaintiffs,**

v.

**STATE OF LOUISIANA,
et al., Defendants.**

**Nos. 92–1522, 95–1241.**

United States District Court,
W.D. Louisiana,
Shreveport Division.

Jan. 5, 1996.

**10.** 638 F.2d at 1342.

**11.** 638 F.2d at 1342–1343.

Robert G. Pugh, Pugh Pugh & Pugh, Shreveport, LA, Jay B. McCallum, Robun & McCallum, Farmerville, LA, Thomas G. Zentner, Jr., Theus Grisham Davis & Leigh, Monroe, LA, Robert Richard Gasaway, Rick L. Richmond, Gerald F. Masoudi, Edward W. Warren, Kirkland & Ellis, Washington, DC, for Ray Hays, Edward L. Adams, Susan Shaw Singleton, Gary Stokley.

Henry M. Bernstein, Office of Attorney General, Shreveport, LA, Roy A. Mongrue, Jr., Angie R. LaPlace, LA Atty. General's Office, Baton Rouge, LA, for State of Louisiana.

Roy A. Mongrue, Jr., Angie R. LaPlace, LA Atty. General's Office, Baton Rouge, LA, for Edwin W. Edwards, Samuel B. Nunez, Jr., John A. Alario, Jr., W. Fox McKeithen, Jerry M. Fowler.

Francis M. Gowen, Jr., Shreveport, LA, A. Leon Higginbotham, Jr., Gregory A. Clarick, Debo Patrick Adegbile, New York City, for Cleo Fields.

Robert B. McDuff, Jackson, MS, Brenda Wright, Todd A. Cox, Lawyers Committee for Civil Rights Under Law, Washington, DC, for Louisiana Legislative Black Caucus.

Jacqueline A. Berrien, Victor A. Bolden, NAACP Legal Defense & Educ Fund, New York City, William P. Quigley, Loyola University School of Law, New Orleans, LA, for Bernadine St. Cyr, Patrick Fontenot, Hazel Freeman, Ralph Wilson.

Before WIENER, Circuit Judge, SHAW, Chief District Judge, and WALTER, District Judge.

PER CURIAM:

For yet a third time, we are called upon to review the constitutionality of a Congressional redistricting plan adopted by the Louisiana Legislature (the Legislature) following the reduction of the state's Congressional delegation as a result of the 1990 census. And for yet a third time we conclude—just as we have concluded twice before (once as to the very plan we review today)—that the redistricting plan enacted by the Legislature violates the equal protection rights of the Plaintiffs. Accordingly, we declare the plan null and void, enjoin the State from holding any future Congressional elections under that redistricting legislation, and supply a redistricting plan to be implemented and used by the State in future Congressional elections under the 1990 census.

## I.

### PROCEEDINGS

At this juncture the procedural posture of the suit has become almost as convoluted as the shapes of some of the districts drawn by the Legislature. Accordingly, we begin with a brief synopsis of the history of the case to date.

### A. HAYS I: CONSIDERING ACT 42

This saga began roughly five years ago, when the Legislature learned that, as a result of the 1990 census, Louisiana's Congressional delegation had been reduced from eight members of the House of Representatives to seven. The Legislature then set about the decennial task of redrawing the state's Congressional districts, ever mindful that, as Louisiana is a "covered jurisdiction" under the § 4(b) of the Voting Rights Act (VRA),[1] any plan adopted would be required to withstand the scrutiny of either the Attor-

---

1. See 42 U.S.C.S. § 1973b(b) (Law.Co-op.1986). Louisiana has been covered by § 4(b) since November 1, 1964. See 28 CFR pt. 51, App.; see also United States v. Hays, —— U.S. ——, ——, 115 S.Ct. 2431, 2433, 132 L.Ed.2d 635 (1995) [hereinafter Hays III ].

ney General or the United States District Court for the District of Columbia.[2]

From the outset the legislators received unmistakable advisories from the Attorney General's office that only redistricting legislation containing two majority-minority districts[3] would be approved ("precleared"), so the Legislature directed its energies toward crafting such a plan.[4] The end product of those efforts was Act 42, passed in May of 1992. Act 42 included two majority-minority districts: District 2, which encompassed the New Orleans region and resembled the majority-minority district of the previous district map[5]; and District 4, which, "[l]ike the fictional swordsman Zorro, when making his signature mark, ... slash[ed] a giant but somewhat shaky 'Z' across the state."[6]

The Attorney General precleared Act 42; and shortly thereafter residents of the newly formed District 4 filed suit against the State, challenging Act 42 under the Louisiana and federal constitutions, as well as the VRA. This three-judge panel was appointed pursuant to 28 U.S.C. § 2284 to hear the case. While we had the case under submission following a two-day trial, the Supreme Court issued its opinion in *Shaw v. Reno,*[7] which requires that strict scrutiny be applied to a districting plan if it is shown that "race was the predominant factor motivating the Legislature's decision to place a significant number of voters within or without a particular district."[8] In light of *Shaw,* we held another two-day evidentiary hearing and received supplemental briefing from the parties and amici curiae. In December of 1993, we issued our first opinion in this case. Focusing principally—but not exclusively—on District 4,[9] we concluded that Act 42's plan violated the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, and accordingly enjoined the use of that plan in any future elections.[10] Prominent among our observations in *Hays I* was the recognition that the Civil Rights division of the Department of Justice was the *bete noir* that caused the Legislature to accept as inevitable the need either to produce a plan comprising two majority-minority districts or be denied preclearance—a recognition ampli-

2. Under § 5 of the VRA, whenever a state that is covered by § 4(b) legislates or administers a new "procedure with respect to voting," it must obtain either a declaratory judgment from the United States District Court for the District of Columbia, or "preclearance" from the Attorney General, verifying that the change "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color." *See* 42 U.S.C.S. § 1973c (Law.Co-op.1986). Redistricting plans constitute a voting procedure subject to the requirements of § 5. *See Hays III,* —— U.S. at ——, 115 S.Ct. at 2433.

3. Throughout this opinion, we use the expression "majority-minority district" to signify a district in which " 'a majority of the population is a member of a specific minority group.' " *See Hays III,* —— U.S. at ——, 115 S.Ct. at 2433 (quoting *Voinovich v. Quilter,* 507 U.S. 146, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993)).

4. *See Hays v. Louisiana,* 839 F.Supp. 1188, 1196 n. 21 (W.D.La.1993) [hereinafter *Hays I*], vacated, —— U.S. ——, 114 S.Ct. 2731, 129 L.Ed.2d 853 (1994).

5. Until the early 1980s, Louisiana's Congressional districting plans contained no majority-minority districts. In 1983, a three-judge panel invalidated the plan in effect at the time, on the ground that it illegitimately diluted minority vot-

ing strength in the New Orleans area. *See Major v. Treen,* 574 F.Supp. 325 (E.D.La.1983). The legislature subsequently enacted a districting plan that included a majority-black district in the New Orleans area. Louisiana's first black representative since Reconstruction was elected by that district in 1990. *See Hays III,* —— U.S. at —— n. *, 115 S.Ct. at 2433 n. *.

6. *Hays I,* 839 F.Supp. at 1199. For a map of Act 42, see Appendix I.

7. 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993).

8. *Miller v. Johnson,* —— U.S. ——, ——, 115 S.Ct. 2475, 2488, 132 L.Ed.2d 762 (1995) (discussing *Shaw* ).

9. *See Hays I,* 839 F.Supp. at 1191 ("District 2 is not challenged in the instant lawsuit.... Rather, District 4 ... is the primary focus of this constitutional challenge.").

10. *See id.* at 1209. We adopt by reference all findings of fact and conclusions of law from our opinion in *Hays I* except to the extent that they were made inapplicable by the repeal of Act 42 and the passage of Act 1 of 1994 and to the extent that they are inconsistent with subsequent Supreme Court precedent.

fied by the Supreme Court in *Miller v. Johnson*.[11]

*Hays I* was appealed directly to the Supreme Court by Louisiana, as defendant, and by the United States, as defendant-intervenor.[12] During the pendency of the appeal, however, the Legislature apparently recognized the impending demise of its Zorroesque handiwork, for it repealed Act 42 and replaced it with Act 1, which also contained two majority-minority districts and which—like Act 42 before it—was promptly precleared by the Attorney General. The Supreme Court accordingly vacated *Hays I* and remanded the case for further proceedings in light of the passage of Act 1.[13]

### B. HAYS II: CONSIDERING ACT 1

On remand, we allowed the plaintiffs to amend their complaint to challenge the constitutionality of Act 1. Like the districts in Act 42, Act 1's two majority-minority districts were still labeled District 2 and District 4. The new District 2 remains embedded in the New Orleans area. District 4, on the other hand, was transformed. Instead of "[running] in a zigzag fashion along the northern and eastern borders of the state" like its Act 42 counterpart,[14] Act 1's District 4 resembles an inkblot which has spread indiscriminately across the Louisiana map.[15]

After considering the evidence presented in yet a third two-day evidentiary hearing and the arguments of the parties and of amici curiae, we issued our opinion in *Hays II*.[16] Again focusing primarily but not exclusively on Act 1's District 4,[17] we concluded that the Louisiana legislators had once again allowed race to be the dominant factor, first in the Legislature's determination to create a

---

11. *See Miller,* —— U.S. at ——–——, 115 S.Ct. at 2491–93; *Hays I,* 839 F.Supp. at 1196 n. 21.

12. *See* 28 U.S.C.S. § 1253 (Law.Co-op.1986).

13. *See Louisiana v. Hays,* —— U.S. ——, 114 S.Ct. 2731, 129 L.Ed.2d 853 (1994).

14. *See Hays III,* —— U.S. at ——, 115 S.Ct. at 2434.

15. *See Hays v. State of Louisiana,* 862 F.Supp. 119, 126 (W.D.La.1994) [hereinafter *Hays II*] (Shaw, C.J., concurring), *vacated,* —— U.S. ——, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995). For a map of Act 1, see Appendix II.

16. 862 F.Supp. 119. We adopt by reference all findings of fact and conclusions of law from our opinion in *Hays II* except to the extent that they are inconsistent with subsequent Supreme Court precedent.

17. We observe again that the Legislature's racial gerrymandering in both Act 42 and Act 1 was not confined to District 4. Just as there can be no heads without tails, no yen without yang, there can be no bizarrely extreme racial gerrymandering of a single voting district without concomitant racial gerrymandering of the adjacent districts. Both times that the Legislature's cartographer pushed his computerized stylus hither and yon around the map of Louisiana to ingest sufficient black neighborhoods into the majority-minority district that became District 4, of necessity he had to do the same thing to the adjoining districts, albeit in reverse. Like the drawing of District 4, the drawing of those abutting districts as confected in Act 1 could not be accomplished without splitting parishes, splitting precincts, splitting metropolitan areas, and combining distant and disparate geographical, economic, social, religious and cultural groups and areas, to produce "bleached" Congressional districts with super-majority white populations, and with disproportionately small black populations.

It has been argued with some validity that as racial bloc voting is a fact of contemporary Louisiana politics, the "packing" of voters by race into different districts minimizes the *influence* of black voters in majority white districts and vice-versa: Racial minority political influence in the resulting super-majority districts—whether black or white—is either lost or significantly diminished because office holders and office seekers no longer need to heed the voices of the minority residents of their districts—here, the whites of District 4, the blacks of the other, "bleached" districts—once their influence has been gerrymandered away.

The redistricting plan of Act 1 leaves none of the five majority white districts with a black population of 25% or more; the plan we drew and ordered implemented in *Hays II,* although comprising one black majority and six white majority districts, contained three white majority districts with at least 25% black population, i.e., three "influence" districts. *See Rural West Tennessee African–American Affairs Council, Inc. v. McWherter,* 877 F.Supp. 1096 (W.D.Tenn.), *aff'd,* —— U.S. ——, 116 S.Ct. 42, 133 L.Ed.2d 9 (1995). Plaintiffs' expert argues convincingly that our plan, with its one black majority and three influence districts, empowers more black voters statewide than does Act 1's plan. By minimizing the number of black voters in the five majority-white districts of Act 1, the Legislature effectively assigned the proxies of those voters to

second majority-minority district and, second, in the determination of exactly where to draw district lines. Accordingly, we declared Act 1 unconstitutional, enjoined its enforcement, and—for the first time—imposed a court-drawn redistricting plan.[18]

Louisiana and the United States again appealed to the Supreme Court. Without addressing the merits of the case, however, the Court determined that the plaintiffs lacked standing to challenge Act 1. The Court noted that the plaintiffs, who had (with one exception) been residents of District 4 under Act 42, all live outside the boundaries of District 4 as it is configured under Act 1. The Court then explained that nonresidents of a challenged district must make a specific evidentiary showing to establish standing:

> Where a plaintiff resides in a racially gerrymandered district, ... the plaintiff has been denied equal treatment because of the legislature's reliance on racial criteria, and therefore has standing to challenge the legislature's action.... On the other hand, where a plaintiff does not live in such a district, ... any inference that the plaintiff has personally been subjected to a racial classification would not be justified

absent specific evidence tending to support that inference.[19]

Concluding that none of the plaintiffs had made a showing of individualized harm, the Court vacated *Hays II* and remanded the case with instructions to dismiss the original plaintiffs' complaint.[20]

## C. THE CURRENT PROCEEDINGS

We share the frustration of the Australian who went bonkers trying to throw away his old boomerang, as this case is back once again in our "home court." We therefore pause before discussing our findings of fact and conclusions of law to delineate our decisions regarding a few preliminary matters.

### 1. *Grant of Leave to Amend Complaint*

■ First, we permitted the plaintiffs to file an amended complaint, adding as plaintiffs residents of Act 1's District 4.[21] We interpreted the Supreme Court's instructions on remand as a directive to allow amendment of the complaint: We were instructed to dismiss the original plaintiffs' complaint but *not* their action. It is well established that a district court should grant leave to amend a complaint even after the original complaint has been dismissed so long as the action is still before the district court[22]; and the Su-

---

the minority residents of Districts 2 and 4—a result which is avoided by our plan.

**18.** *See* Appendix III.

**19.** *Hays III,* —— U.S. at ——, 115 S.Ct. at 2436 (citation omitted).

**20.** *Id.* at ——, 115 S.Ct. at 2437.

**21.** At the time that the plaintiffs filed their motion for leave to amend the original complaint, they also initiated a new action by filing a complaint identical to their proposed amended complaint. Accordingly, when we granted leave to amend the original complaint, we consolidated the new action with the original action.

**22.** FED.R.CIV.P. 15(a) provides that "leave shall be freely granted when justice so requires." The Supreme Court has warned that "this mandate should be heeded," that plaintiffs should be "afforded an opportunity to test [their] claim[s] on the merits," and that absent a reason such as delay, bad faith, prejudice, or futility, the leave sought should be granted. *See Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962).

Similarly, the Fifth Circuit has stated that leave should be freely granted. *See Jamieson By and Through Jamieson v. Shaw,* 772 F.2d 1205, 1208 (5th Cir.1985). While noting that "this determination [of whether to grant leave to amend] rests in the sound discretion of the district court," this circuit has emphasized that the Federal Rules of Civil Procedure " 'evince a bias in favor of granting leave.' " *See id; see also Chitimacha Tribe of Louisiana v. Harry L. Laws Co.,* 690 F.2d 1157, 1163 (5th Cir.1982) (citing *Dussouy v. Gulf Coast Investment Corp.,* 660 F.2d 594, 597 (5th Cir.1981)), *cert. denied,* 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983). Accordingly, the Fifth Circuit has held that if the district court lacks a "substantial reason" to deny leave, its discretion is "not broad enough to permit denial." *See Jamieson,* 772 F.2d at 1208; *Dussouy,* 660 F.2d at 598.

For similar rulings by other circuits, see *Newark Branch, N.A.A.C.P. v. Town of Harrison, N.J.,* 907 F.2d 1408 (3d Cir.1990) (holding that district court could exercise its discretion as to whether the plaintiff should be granted leave to amend its complaint after the original complaint had been dismissed for lack of standing); *Czeremcha v. Int'l Ass'n of Mach. & Aero. Workers,* 724 F.2d 1552, 1554–56 (11th Cir.1984) (holding that after a complaint is dismissed, the plaintiff may move

preme Court has indicated that a refusal to grant leave under such circumstances "[i]n the absence of any declared or apparent reason" constitutes an abuse of discretion.[23] Similarly, the Fifth Circuit has held that when an action remains before the district court, the court's discretion is "not broad enough to permit denial" of leave to amend unless the court finds a "substantial reason" for the denial.[24] In the instant case, the action remains properly before us on remand; and we found no substantial reason— such as " 'undue delay, bad faith or dilatory motive on the part of the movant' " [25]—to deny leave. Accordingly, in light of the Court's instructions, we allowed the original plaintiffs to file their second amended complaint, which added an additional eight plaintiffs.

### 2. Grant of Partial Summary Judgment on Issue of Standing

After amending their complaint, the plaintiffs moved for summary judgment on the issue of standing. Summary judgment can be rendered under Federal Rule of Civil Procedure 56(a) for "all or any part" of a claimant's case. A grant of summary judgment is appropriate if

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.[26]

In the case before us, none dispute that the amended complaint added eight plaintiffs who reside and are registered to vote in District 4, as configured under Act 1. The Supreme Court has held that the residents of a district allegedly the product of racial gerrymandering have standing to challenge the district. When considering the appeal of Hays II, for example, the Supreme Court expressly stated that "[w]here a plaintiff resides in a racially gerrymandered district ... the plaintiff has been denied equal treatment because of the legislature's reliance on racial criteria, and therefore has standing to challenge the legislature's action." [27] Similarly, in Miller v. Johnson,[28] a companion case of the Court's latest Hays ruling, wherein the implications of Shaw are clarified, the Court concluded that, "[a]s residents of the challenged Eleventh District [of Georgia], all appellees had standing." [29]

We are convinced that the eight residents of Act 1's District 4 have standing to bring this suit. Moreover, as long as one plaintiff's claim satisfies constitutional standing requirements, federal jurisdiction is properly invoked; no further analysis of the threshold standing issue is necessary.[30] Accordingly, the plaintiffs were entitled to judgment as a matter of law on the issue of standing, and their motion for partial summary judgment on that issue was granted.

### 3. The Evidentiary Hearing

Having determined that the plaintiffs have standing to proceed, we held our fourth

---

the court for leave to amend, "and such amendments should be granted liberally"); Guse v. J.C. Penney Co., Inc., 570 F.2d 679, 680 (7th Cir. 1978) (holding that even though case had been remanded to district court with instructions to dismiss the complaint, district court was not instructed to dismiss the action and so could exercise its discretion with regard to whether the plaintiffs should be allowed to amend their complaint).

23. Foman, 371 U.S. at 182, 83 S.Ct. at 230.

24. See Jamieson, 772 F.2d at 1208; Dussouy, 660 F.2d at 598. See also Whitaker v. City of Houston, Tex., 963 F.2d 831 (5th Cir.1992).

25. Whitaker, 963 F.2d at 836 (quoting Foman, 371 U.S. at 182, 83 S.Ct. at 230).

26. FED.R.CIV.PRO. 56(c).

27. Hays III, —— U.S. at ——, 115 S.Ct. at 2436.

28. —— U.S. ——, 115 S.Ct. 2475 (holding that a Georgia Congressional district violated the equal protection clause, as race was the "predominant factor" motivating its design).

29. Id. at ——, 115 S.Ct. at 2485.

30. See Watt v. Energy Action Educ. Found., 454 U.S. 151, 160, 102 S.Ct. 205, 212, 70 L.Ed.2d 309 (1981) ("Because we find California has standing, we do not consider the standing of the other plaintiffs."); Arlington Heights v. Metro. Housing Corp., 429 U.S. 252, 264 n. 9, 97 S.Ct. 555, 562 n. 9, 50 L.Ed.2d 450 (1977); Allandale Neighborhood Ass'n v. Austin Transp. Study Policy Comm., 840 F.2d 258, 263 (5th Cir.1988);

evidentiary hearing in this case.[31] In the interest of judicial economy, given the extensive evidence already presented in the case and the parties' unanimous agreement to stand on the prior record, we placed limitations on the presentation of further evidence: Each side was granted a total of four "real time" hours in which to present its case. That four hours included time for opening and closing arguments, direct questioning of witnesses, and cross-examination. We specified that each side could present live testimony of one expert witness only (but the depositions or agreed written statements of as many experts as they wished to submit), together with sworn statements of fact witnesses outside our subpoena power and live testimony of as many fact witnesses as they wished to call during the time they had remaining.

The defendants complain that these specifications infringed on their constitutional due process rights. We disagree. An extensive record had been developed previously, and all parties to this latest hearing agreed to adopt the prior record in the current proceedings. *Hays II* had been remanded by the Supreme Court on grounds entirely unrelated to the merits of the case, leaving us with no reason to doubt that the prior record was more than sufficient for a proper legal determination of the issues involved. Regardless, it is perhaps most significant that neither side used the full amount of its allotted time; and in the time that each did use, nothing but essentially redundant, cumulative evidence was adduced. This is not surprising given that absolutely *nothing* new has occurred factually since the conclusion of the two-day evidentiary hearing for *Hays II* in July of 1994.

We thus conclude that the due process complaints of the defendants are unmeritorious, and that defendants' due process rights were not violated by the schedule we set for the latest hearing.

## II.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

 With those preliminary issues clarified, we address the heart of the matter: Does District 4 of Act 1 constitute a racial gerrymander in violation of the Equal Protection Clause of the United States Constitution? We held in *Hays II* that it does; nothing has changed factually; the law from the Supreme Court is even clearer; and thus we conclude again that such a violation did and continues to occur. In *Miller v. Johnson*,[32] which presents us with what we in Louisiana call a "Goose" case,[33] the Supreme Court delineated the appropriate analysis for addressing that question. The first step in the analysis is to determine whether "the legislature subordinated traditional race-neutral districting principles ... to racial considerations."[34] If the court finds that race was in fact the "predominant, overriding factor" explaining the design of the district,[35] then the redistricting plan cannot be upheld unless it is narrowly tailored to achieve a compelling state interest.[36]

### A. The Role of Race in the Creation of District 4

The evidence presented by both parties in the latest hearing added little except to confirm our earlier finding that race was the

---

*Hanson v. Veterans Admin.*, 800 F.2d 1381, 1386 (5th Cir.1986).

**31.** In the meantime we had, despite our concerns for the delay and confusion it might produce, allowed intervention by Louisiana's Fourth District Congressmen Cleo Fields, the Louisiana Legislative Black Caucus, and individual residents of District 4. Intervenors participated in this fourth hearing, adding nothing new by way of relevant and material evidence. Still, they had their "day(s) in court."

**32.** —— U.S. ——, 115 S.Ct. 2475.

**33.** Louisianians call commanding precedent, factually on all fours, a "Goose" case. Such precedent is also known as a "Spotted Horse" or "Spotted Dog" case in Alabama, a "Cow" case in Kansas, and a "White Horse" or "White Pony" case in Texas. *See Jefferson v. Ysleta Independent School Dist.*, 817 F.2d 303, 305 n. 1 (5th Cir. 1987).

**34.** *Miller,* —— U.S. at ——, 115 S.Ct. at 2488.

**35.** *Id.* at ——, 115 S.Ct. at 2490.

**36.** *Id.*

"fundamental factor" driving the design of Act 1.[37] As we used that phrase, "fundamental" is synonymous with "predominant." The record is replete with both direct and circumstantial evidence supporting this conclusion, and the putative race-neutral explanations espoused by defense witnesses are frivolous.

### 1. Circumstantial Evidence

The evidence at trial established that legislators who considered Act 1 initially disregarded and subsequently subordinated traditional race-neutral districting principles—such as compactness, respect for commonality of interests, and respect for political subdivisions—to enact a plan containing a second majority-minority district.[38] And, as was the case with Act 42, even contiguity was honored only by cynical formalism.

Far from being compact, District 4 winds its way through fifteen of Louisiana's sixty-four parishes (only three of the fifteen are whole parishes) and is approximately 250 miles long, considerably longer than any other district in the state.[39] The District thinly links minority neighborhoods of several municipalities from Shreveport in the northwest to Baton Rouge in the southeast (with intermittent stops along the way at Alexandria, Lafayette, and other municipalities), thereby artificially fusing numerous and diverse cultures, each with its unique identity, history, economy, religious preference, and other such interests. Along its otherwise aimless and tortuous path the District splits twelve of its fifteen parishes, as well as fourteen municipalities, among which are included four of Louisiana's five largest population centers.

As was true in *Miller*, when the shape of the District is viewed "in conjunction with its racial and population densities,"[40] the fact that race was the predominant factor behind Act 1 becomes overwhelmingly clear. Every time that the District splits a parish, it gathers in a disproportionate number of black voters and excludes a disproportionate number of white voters. Every time that the District splits a municipality, it gathers in a disproportionate number of black voters and excludes a disproportionate number of white voters. The plaintiffs presented credible evidence demonstrating that, even down to the precinct level, the State considered only race in determining which pockets of voters to pull in and which pockets of voters to push out. In the words of the *Miller* Court, such statistics are "quite compelling" as evidence that District 4 is unexplainable other than by race.[41]

### 2. Direct Evidence

But, as was the case in *Hays I* and again in *Hays II*, we need not even consider—much less rest our holding on—circumstantial evidence. Once again the plaintiffs have adduced ample direct evidence that race alone predominated the design of District 4. The cartographer charged with creating Act 1's districts readily admits that, in creating District 4, he concentrated virtually exclusively on racial demographics and considered essentially no other factor except the ubiquitous constitutional "one person-one vote" requirement.[42] The combined record—including the testimony of numerous legislators—clearly establishes the reason for this focus: The Legislature was justifiably convinced that the United States Department of Justice would preclear no redistricting plan for Louisiana that failed to include a second majority-minority district. Accordingly, by the legislators' own admissions, Act 1 was passed for the very reason that it was effective in separating black voters from white.[43]

---

37. *See Hays II*, 862 F.Supp. at 122.

38. *Id.* at 126 (Shaw, C.J., concurring).

39. *Id.* at 127 (Shaw, C.J., concurring).

40. *Miller*, —— U.S. at ——, 115 S.Ct. at 2489.

41. *Id.*

42. *See, e.g., Wesberry v. Sanders*, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964).

43. *See Hays II*, 862 F.Supp. at 122 ("Misinterpreting our opinion of December 1993 as approving a racially gerrymandered district if it contained no more than 55% minority registered voters; and remaining convinced that the Department of Justice would not preclear any plan that did not contain two majority-minority districts, the Legislature embarked on an endeavor to comply with those demands and still secure adoption.").

The Department of Justice actively reinforced the legislators' belief that it would not preclear any plan without a second majority-minority district. After the repeal of Act 42, and while the Legislature was debating new redistricting legislation, the Department issued a letter informing legislators of its conclusion "that the Voting Rights Act requires the state to devise a congressional redistricting plan with two black-majority districts." The Department took this action despite language in *Hays I* emphasizing that the Voting Rights Act simply "does not justify [an] insistence upon two black districts." [44] As this court has maintained time and again,[45] and as the *Miller* Court has confirmed,[46] by demanding a maximization of majority-minority districts the Justice Department impermissibly encouraged—nay, mandated—racial gerrymandering. The State's desire to comply with the Department's policy only reinforces the conclusion that the Legislature knowingly allowed race to become the predominant factor driving the enactment of Act 1.[47] The perverted syllogism becomes irrefutably apparent: The Department of Justice will preclear a redistricting plan only if it includes two majority-minority districts out of seven; the Legislature must obtain timely preclearance; ergo, the Legislature must adopt a plan containing at least two majority-minority districts.

### 3. *Proffered Race–Neutral Explanations*

The defense offers three weak race-neutral explanations for the shape of District 4: (1) the boundaries were intended to coincide with the lines of Louisiana's "Old Eighth" district; (2) the District was designed to follow the Red River; and (3) the District is actually majority-poor, rather than majority-black. The latter two explanations are patently post-hoc rationalizations. Evidence adduced at trial established that neither the

Red River nor socio-economic factors were relied on by legislators at the time of the drawing of the district.

The contention that District 4 merely resurrects the Old Eighth district is equally spurious, albeit slightly less obvious. Again, the cartographer responsible for confecting the details of Act 1 candidly concedes that the Old Eighth itself was used as a guise for amassing a large percentage of minority voters into one district, not as a means of following traditional district boundaries. Thus, the use of the Old Eighth to explain away the "new" Fourth merely reinforces the conclusion that race motivated the design of District 4.[48]

### B. THE APPLICATION OF STRICT SCRUTINY

■ As they did in each prior incarnation of this case, the plaintiffs have decisively established that race was the predominant factor behind the Legislature's determination to draw a district map with two of seven districts being majority-minority, and that race was the predominant factor driving the configuration of District 4. Accordingly, Act 1 cannot be upheld unless it satisfies strict scrutiny. In other words, the State must demonstrate that, despite being predominantly race-based, its districting legislation is narrowly tailored to achieve a compelling governmental interest.[49] We first examine whether the State has set forth a sufficiently compelling state interest to justify its racial gerrymander.

### 1. *Alleged Compelling State Interests*
#### a. *The Voting Rights Act*

■ The primary justification espoused by the State for the enactment of District 4 has been that a second majority-minority district was *required* under the Voting Rights Act. The *Miller* Court addressed this argument,

---

**44.** *Hays I,* 839 F.Supp. at 1196 n. 21.

**45.** *See id.; Hays II,* 862 F.Supp. at 123 n. 3.

**46.** *See Miller,* —— U.S. at ——, 115 S.Ct. at 2492–93.

**47.** *See id.* at ——, 115 S.Ct. at 2489.

**48.** We note as well that the "Old Eighth" was never challenged on constitutional grounds. We

suspect that if challenged today, that district would meet the same fate as District 4, as it was formed unabashedly with the intention of gathering minority voters into one district to ensure the re-election of longtime Louisiana Congressman Gillis Long.

**49.** *See Miller,* —— U.S. at ——, 115 S.Ct. at 2490.

and its conclusion applies in equal measure to the instant case:

> Whether or not in some cases compliance with the Voting Rights Act, standing alone, can provide a compelling interest independent of any interest in remedying past discrimination, it cannot do so here.... [C]ompliance with federal antidiscrimination laws cannot justify race-based districting where the challenged district was not reasonably necessary under a constitutional reading and application of those laws.[50]

Reduced to its essentials, the VRA simply does not *require* the enactment of a second majority-minority district in Louisiana. The Justice Department's conclusion to the contrary is both incorrect and irrelevant: "When the Justice Department's interpretation of the Act compels race-based districting, it by definition raises a serious constitutional question, and should not receive deference." [51]

We have emphasized from the very outset of this case that neither § 5 nor § 2 of the VRA mandates a second majority-minority district in Louisiana.[52] First, the Supreme Court has specified that the purpose of § 5 " 'has always been to insure that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise.' " [53] In this case, however, a redistricting plan that included one black majority district would have satisfied the nonretrogression requirement. As discussed above, the redistricting legislation resulted from the reduction of Louisiana's Congressional delegation from eight representatives to seven. Thus, a plan with one majority-minority district would actually have increased the relative voice of a representative from that district: "[W]hereas before black majority districts

comprised one-eighth of all districts, under a new plan with one black majority district, such districts would constitute one-seventh of all districts, an increase of nearly two percent." [54]

Similarly, § 2 of the VRA simply does not require the creation of District 4. In *Thornburg v. Gingles*,[55] the Supreme Court specified three factors required to make out a § 2 "dilution" claim: (1) a numerous and compact minority, that is (2) politically cohesive, and (3) subject to majority bloc voting usually defeating the minority's preferred candidate.[56] We reiterate now our conclusion in *Hays II:* "The evidence convincingly proves that the State cannot clear the first *Gingles* hurdle." [57] District 4 meanders for roughly 250 miles from the northwestern corner of the state to the southeast, dividing parishes and municipalities while surgically agglomerating pockets of minority populations along the way. The reasons that it does so is obvious: Outside New Orleans, the black population of Louisiana is so widely and evenly dispersed that, to create a Congressional district that meets the one-person-one-vote criterion *and* has even a simple majority black population, resort must be had to graphic design that constitutes racial Rorschach-ism. The threshold compactness requirement of *Gingles* has not been met and cannot be met, so § 2 of the VRA—like § 5—cannot be relied on as a compelling governmental interest to justify the enactment of Act 1.

### b. *Remedying Past Discrimination*

◼ The defendants also advance the rationale that District 4 was created to remedy the effects of a history of discrimination in Louisiana. We acknowledge that there is " 'a significant state interest in eradicating the

---

**50.** *Id.* at ——, 115 S.Ct. at 2490–91.

**51.** *Id.* at —— – ——, 115 S.Ct. at 2491–92 (citations omitted).

**52.** *See Hays I,* 839 F.Supp. at 1196 n. 21; *Hays II,* 862 F.Supp. at 123–24.

**53.** *See Hays I,* 839 F.Supp. at 1196 n. 21 (quoting *Beer v. United States,* 425 U.S. 130, 141, 96 S.Ct. 1357, 1364, 47 L.Ed.2d 629 (1976)).

**54.** *Id.*

**55.** 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).

**56.** *Id.* at 50–51, 106 S.Ct. at 2766–67.

**57.** *Hays II,* 862 F.Supp. at 124.

effects of past racial discrimination.' " [58] Moreover, we in no way wish to understate the gravity of Louisiana's well-documented history of racial discrimination with regard to its voting policies.[59] But history it is; and we are constrained by the fact that the defendants have failed to provide any concrete evidence of the lingering effects of past discrimination in current voting laws and procedures. Neither have they provided any credible evidence that the Legislature considered this motivation when it adopted Act 1. The Supreme Court has decreed that a remedial plan may constitutionally be enacted only if there exists a " 'strong basis in evidence for its conclusion that remedial action was necessary.' " [60] As the State has failed to meet its evidentiary burden in this respect, we cannot conclude that remedying vestigial effects of past discrimination warrants the racial gerrymandering involved in the creation of District 4. Generalized societal "remedying" of past discrimination can never meet the Supreme Court's requirement of particularized solutions for specifically identifiable vestiges of past discrimination.[61]

### 2. *Narrow Tailoring*

■ Finally, we note that even if we were to assume arguendo that the defendants had adequately established a compelling governmental interest sufficient to justify a racial gerrymander, District 4 would still fail to withstand strict scrutiny. When viewed in light of the plethora of evidence adduced and recounted in prior iterations of this case, it simply cannot be said that District 4 is nar-

rowly tailored to achieve remediation. Indeed, "[t]he fact that outside of the Orleans Parish area, the minority ... population is relatively dispersed throughout the rest of the State, elicited the question of whether it was even possible to develop a districting plan that creates a second majority-minority district and is narrowly tailored, in the sense that the plan in total does not unduly burden the rights of third parties." [62] Even if Act 42's "Zorro" District 4 were held up as the benchmark against which the "tailoring" of Act 1's District 4 is to be tested for narrowness—and it is not—the heavy-handed confection of the current district would fall woefully short.

### III.

### CONCLUSION

We find from the cumulative record of this case that Act 1's District 4 was and is the product of racial gerrymandering and was not narrowly tailored to further a compelling state interest. Accordingly, we hold that Act 1 violates the Plaintiffs' right to equal protection as guaranteed by the United States Constitution, and must be stricken as unconstitutional.

### IV.

### REMEDY

■ In crafting a remedy today we cannot turn a blind eye on the record of the Legislature and the United States Department of Justice in the context of Louisiana's

---

**58.** *Miller,* —— U.S. at ——, 115 S.Ct. at 2490 (quoting *Shaw,* 509 U.S. at 656, 113 S.Ct. at 2831).

**59.** *See, e.g., United States v. State of Louisiana,* 225 F.Supp. 353 (E.D.La.1963), *aff'd,* 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965); *Major v. Treen,* 574 F.Supp. 325 (E.D.La.1983).

**60.** *Richmond v. J.A. Croson Co.,* 488 U.S. 469, 500, 109 S.Ct. 706, 725, 102 L.Ed.2d 854 (1989) (quoting *Wygant v. Jackson Board of Education,* 476 U.S. 267, 277, 106 S.Ct. 1842, 1849, 90 L.Ed.2d 260 (1986) (plurality opinion)).

**61.** *See id.* at 498–508, 109 S.Ct. at 724–30. The defendants argue that they have met their evidentiary burden on this issue by establishing (1) that

no black candidate has been elected either to the United States Congress or to the Louisiana legislature from a district that is majority white, and (2) that racial bloc voting exists in Louisiana. While these voting patterns may very well have been influenced by the "sorry history of both private and public discrimination in this country," standing alone they are insufficiently connected to past discrimination in voting laws and procedures to support the racial gerrymandering by the State in Act 1. *See id.* at 499, 109 S.Ct. at 724–25; *cf. Gingles,* 478 U.S. at 50–52, 106 S.Ct. at 2766–67 (holding that evidence of racial bloc voting, without more, is insufficiently connected to electoral laws and procedures to support a claim under § 2 of the VRA).

**62.** *Hays II,* 862 F.Supp. at 128 (Shaw, C.J., concurring).

Congressional redistricting efforts following the 1990 Decennial Census. First, disrespecting historical political units and other traditional redistricting criteria, the Legislature succumbed to the illegitimate preclearance demands of the Justice Department and adopted Act 42 of 1992 with its now-infamous "Zorro" Fourth District. When, in *Hays I,* the plaintiffs prevailed in having us strike down as unconstitutional the redistricting plan embodied in Act 42, the Legislature reacted, not by repudiating the unjustified demands of the Justice Department for maximizing majority-minority districts, but by merely repealing Act 42 and enacting Act 1 of 1994, with its physically modified but conceptually indistinguishable "new" Fourth District, again violating historical political subdivisions and ignoring other traditional redistricting criteria.

After we again, in *Hays II,* struck down the Legislature's unconstitutional racial gerrymandering, the Legislature—with the advice and consent of the Department of Justice—continued its vigorous legal defense of its actions. This defense persisted even after the handwriting of the opinion in *Miller v. Johnson* was visible on the wall. For neither before nor after *Miller* did the Legislature see fit to fold its tents, repeal Act 1, and adopt a constitutionally defensible congressional redistricting plan, either one of its own conception or the one ordered by this court in *Hays II.*

Even now, the Legislature persists in defending the indefensible. In its record of doggedly clinging to an obviously unconstitutional plan, the Legislature has left us no basis for believing that, given yet another chance, it would produce a constitutional plan.[63] It is therefore with regret and reluctance, but with no other choice perceived, that we hold as follows:

1. The Congressional redistricting plan for the State of Louisiana embodied in Act 1 of 1994, is declared null and void, and of no further force and effect.

2. The State of Louisiana is enjoined from holding any future elections based on the plan embodied in Act 1.

3. Past elections based on Act 1 are nevertheless left undisturbed.

4. The State of Louisiana is directed to implement the redistricting plan drawn by this court and ordered implemented in *Hays II.*[64] As every aspect of this case remains unchanged by the latest evidentiary hearing, our plan as well remains unchanged: "The districts that we draw split only six parishes of the sixty-four, follow traditional lines, only one town of approximately 3,000 [is] divided, and the plan [meets] all Constitutional one [person]—one vote requirements. It [does] ignore all political considerations. And, instructed by *Gingles,* we [do] not carve districts along race lines, except in District 2, where the Constitution and fairness requir[e] us to consider it."[65]

---

**63.** No basis, that is, except the changes in personnel wrought by the 1995 legislative elections. What if any effect that might have is too speculative for our purposes today.

**64.** Reproduced in toto and attached hereto as Appendix III.

**65.** *Hays II,* 862 F.Supp. at 125.

373

APPENDIX I

District 4

(Act 42)

APPENDIX II

(Act 1)

APPENDIX III

(*Hays II* Plan)

**LOUISIANA CONGRESSIONAL DISTRICTS**

The State of Louisiana is divided into the following seven Congressional Districts:

### DISTRICT 1

District 1 is composed of Precincts 3–G, 5–G, 8–G, 9–G, 10–G, 1–H, 2–H, 3–H, 4–H, 5–H, 6–H, 7–H, 8–H, 9–H, 1–K, 2–K, 3–K, 4–K, 5–K, 6–K, 7–K, 8–K, 9–K, 10–K, 11–K, 12–K, 13–KA, 15–K, 16–K, 17–K, 18–K, 19–K, 20–K, 25–K, 27–K, 28–K, 34–K, 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 51,

52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, 100, 101, 102, 103, 105, 106, 116, 117, 118, 119, 120, 121, 122, 123, 124, 125, 126, 127, 128, 129, 130, 132, 134, 135, 136, 137, 170, 171, 174B, 175, 176, 177, 178, 182, 183, 184, 185, 193, 194A, 195, 210, 211, 225, 226, 227, 228, 229, 230, 231, and 234 of Jefferson Parish; Precincts 3–20, 4–8, 4–9, 4–10, 4–10A, 4–11, 4–12, 4–13, 4–13A, 4–14, 4–14A, 4–15, 4–16, 4–16A, 4–17, 4–17A, 4–18, 4–18A, 4–19, 4–20, 4–20A, 4–21, 4–21A, 4–22, 4–23, 5–12, 5–13, 5–14, 5–15, 5–16, 5–17, 5–18, 5–19, 7–33A, 7–40, 7–41, 7–42, 12–4, 13–1, 14–1, 14–2, 14–3, 14–4, 14–8, 14–9, 14–10, 14–11, 16–2, 17–1, 17–17, 17–18, 17–18A, 17–18B, 17–19, 17–19A, 17–20, and 17–21 of Orleans Parish; St. Tammany Parish; Tangipahoa Parish; and Washington Parish.

## DISTRICT 2

District 2 is composed of Precincts 1–G, 2–G, 4–G, 6–G, 7–G, 11–G, 13–KB, 14–K, 21–K, 22–K, 23–K, 24–K, 26–K, 29–K, 30–K, 31–K, 32–K, 33–K, 1–W, 2–W, 3–W, 4–W, 5–W, 6–W, 7–W, 8–W, 9–W, 104, 107, 115, 131, 133, 138, 150, 151, 152, 153, 154, 155, 156, 157A, 157B, 172, 173, 174A, 179A, 179B, 180, 181, 186, 187, 188, 189, 190, 191, 192, 194B, 196, 197, 198, 212, 213A, 213B, 213C, 214, 215, 232, 233, 235, 236, 237, 246A, and 246B of Jefferson Parish and Precincts 1–1, 1–2, 1–5, 1–6, 1–7, 2–1, 2–2, 2–3, 2–4, 2–5, 2–6, 2–6A, 2–7, 3–1, 3–3, 3–4, 3–5, 3–6, 3–7, 3–8, 3–9, 3–10, 3–12, 3–13, 3–14, 3–15, 3–16, 3–17, 3–18, 3–19, 4–2, 4–3, 4–4, 4–5, 4–6, 4–7, 5–1, 5–2, 5–3, 5–4, 5–5, 5–6, 5–7, 5–8, 5–9, 5–10, 5–11, 6–1, 6–2, 6–4, 6–5, 6–6, 6–7, 6–8, 6–9, 7–1, 7–2, 7–4, 7–4A, 7–5, 7–6, 7–7, 7–8, 7–9, 7–9A, 7–10, 7–11, 7–12, 7–13, 7–14, 7–15, 7–16, 7–17, 7–18, 7–19, 7–20, 7–20A, 7–21, 7–22, 7–23, 7–24, 7–25, 7–25A, 7–26, 7–26A, 7–27, 7–27A, 7–27B, 7–28, 7–28A, 7–29, 7–30, 7–31, 7–32, 7–33, 7–34, 7–35, 7–36, 7–36A, 7–37, 7–37A, 7–38, 7–38A, 7–39, 8–1, 8–2, 8–4, 8–5, 8–6, 8–7, 8–8, 8–9, 8–10, 8–11, 8–12, 8–13, 8–14, 8–15, 8–16, 8–17, 8–18, 8–19, 8–20, 8–21, 8–22, 8–23, 8–24, 8–25, 8–25A, 8–26, 8–26A, 8–27, 8–27A, 8–28, 8–29, 8–30, 9–1, 9–2, 9–3, 9–3A, 9–3B, 9–4, 9–5, 9–5A, 9–6A, 9–6B, 9–6C, 9–6D, 9–6E, 9–6F, 9–7, 9–8, 9–8A, 9–8B, 9–9, 9–10, 9–11, 9–12, 9–13, 9–14, 9–15, 9–16, 9–17, 9–18, 9–19, 9–20, 9–21, 9–22, 9–23, 9–24, 9–25, 9–25A, 9–26, 9–26A, 9–27, 9–28, 9–28A, 9–28B, 9–28C, 9–28D, 9–28E, 9–28F, 9–29, 9–29A, 9–30, 9–30A, 9–31, 9–31A, 9–31B, 9–31C, 9–31D, 9–31E, 9–32, 9–33, 9–33A, 9–34, 9–34A, 9–35, 9–35A, 9–36, 9–36A, 9–36B, 9–36C, 9–37, 9–37A, 9–38, 9–38A, 9–38B, 9–39, 9–39A, 9–39B, 9–40, 9–40A, 9–40B, 9–40C, 9–41, 9–41A, 9–41B, 9–41C, 9–41D, 9–42, 9–42A, 9–42B, 9–42C, 9–42D, 9–42E, 9–43, 9–43A, 9–43B, 9–43C, 9–43D, 9–43E, 9–43F, 9–43G, 9–43H, 9–43I, 9–43J, 9–43K, 9–43L, 9–43M, 9–43N, 9–44, 9–44A, 9–44B, 9–44C, 9–44D, 9–44E, 9–44F, 9–44G, 9–44H, 9–44I, 9–44J, 9–44K, 9–44L, 9–44M, 9–44N, 9–44O, 9–44P, 9–44Q, 9–45, 9–45A, 10–3, 10–4, 10–5, 10–6, 10–7, 10–8, 10–9, 10–10, 10–11, 10–12, 10–13, 10–14, 11–1, 11–2, 11–3, 11–4, 11–5, 11–6, 11–7, 11–8, 11–9, 11–10, 11–11, 11–12, 11–13, 11–14, 11–15, 11–16, 11–17, 11–18, 11–19, 12–1, 12–2, 12–3, 12–5, 12–6, 12–7, 12–8, 12–9, 12–10, 12–11, 12–12, 12–13, 12–14, 12–15, 12–16, 12–17, 12–18, 12–19, 12–20, 13–2, 13–3, 13–4, 13–5, 13–6, 13–7, 13–8, 13–9, 13–10, 13–11, 13–12, 13–13, 13–14, 13–14A, 13–15, 13–16, 14–5, 14–6, 14–7, 14–12, 14–13, 14–13A, 14–14, 14–15, 14–16, 14–17, 14–18, 14–18A, 14–19, 14–20, 14–21, 14–22, 14–23, 14–24, 14–24A, 14–25, 14–26, 14–26A, 15–1, 15–2, 15–3, 15–4, 15–5, 15–6, 15–7, 15–8, 15–9, 15–10, 15–11, 15–11A, 15–12, 15–12A, 15–13, 15–13A, 15–13B, 15–14, 15–14A, 15–14B, 15–14C, 15–14D, 15–14E, 15–14F, 15–14G, 15–15, 15–15A, 15–15B, 15–16, 15–17, 15–17A, 15–17B, 15–18, 15–18A, 15–18B, 15–18C, 15–18D, 15–18E, 15–18F, 15–19, 15–19A, 15–19B, 15–19C, 16–1, 16–1A, 16–3, 16–4, 16–5, 16–6, 16–7, 16–8, 16–9, 17–2, 17–3, 17–4, 17–5, 17–6, 17–7, 17–8, 17–9, 17–10, 17–11, 17–12, 17–13, 17–13A, 17–14, 17–15, and 17–16 of Orleans Parish.

## DISTRICT 3

District 3 is composed of Precincts 13, 14, 15, 16A & 16B, 27A, 27B, 28, 29, 31, 32, 33, 34, 35A, 35B, 36, 37, 40, 41, and 42 of Ascension Parish; Assumption Parish; Iberia Parish; Precinct 1–GI, 1–LA, 1–LB, 2–L, 216, 217, 238, 247, 248, 249, and 250 of Jefferson Parish; Lafourche Parish; Plaquemines Parish; St. Bernard Parish; St. Charles Parish; St. James Parish; St. John the Baptist Parish; Precincts 1–1, 1–2, 1–3, 1–4, 1–5, 1–6, 1–7, 2–

1 & 2–3, 2–2, 2–4, 3–1, 3–2, 3–3, 3–4, 3–5, 3–6, 3–7, 3–8, 3–9, 4–1, 4–2, 4–3, 4–4, 4–5, 4–6, 5–1, 5–2, 5–3 & 5–4, 6–1, 6–2, 6–3, 6–4, 7–1, 7–2, 7–3, 7–4, 8–1, 8–2, 8–3, 8–4, 9–1, 9–4, and 9–5 of St. Martin Parish; St. Mary Parish; and Terrebonne Parish.

& 10B, 11A & 11B, 12, 21A & 21B, 22A, 22B, and 23 of Ascension Parish; East Baton Rouge Parish; East Feliciana Parish; Iberville Parish; Livingston Parish; Pointe Coupee Parish; St. Helena Parish; West Baton Rouge Parish; and West Feliciana Parish.

## DISTRICT 4

District 4 is composed of Precincts 1–1, 1–3, 1–4, 1–6, 1–7, 2–6–O, 3–1, 4–1, 4–2, 4–3, 5–2, 5–2A*, 5–5, and 5–10 of Allen Parish; Beauregard Parish; Bienville Parish; Bossier Parish; Caddo Parish; Claiborne Parish; De Soto Parish; Natchitoches Parish; Red River Parish; Sabine Parish; Vernon Parish; and Webster Parish.

## DISTRICT 5

District 5 is composed of Avoyelles Parish; Caldwell Parish; Catahoula Parish; Concordia Parish; East Carroll Parish; Precincts 1–2, 1–13–0, 1–13–1, 4–1–2R, 4–1–3R, 4–1C, 4–2–0, 4–2–1, 4–3, 4–4, 5–1, 5–2–0, 5–2–1, 5–2–2, 5–3, 5–4C, 5–4R, and 5–5 of Evangeline Parish; Franklin Parish; Grant Parish; Jackson Parish; La Salle Parish; Lincoln Parish; Madison Parish; Morehouse Parish; Quachita Parish; Rapides Parish; Richland Parish; Tensas Parish; Union Parish; West Carroll Parish; and Winn Parish.

## DISTRICT 6

District 6 is composed of Precincts 1, 2A & B, 3, 4A, 4B, 5A, 5B, 6, 7A, 8A & 8B, 9, 10A

## DISTRICT 7

District 7 is composed of Acadia Parish; Precincts 1–2, 1–5, 2–1, 2–2–C, 2–2–O, 2–3, 2–4–C, 2–4–O, 2–5, 2–6–C, 3–2, 5–1, 5–3, 5–3A*, 5–4–C, 5–4–O, 5–4–X*, 5–4–Y*, 5–6, 5–7, 5–8, 5–8A*, 5–9, 5–11, 5–12, and 5–13 of Allen Parish; Calcasieu Parish; Cameron Parish; Precincts 1–1, 1–3, 1–4–0R, 1–4–1R, 1–4C, 1–5–0, 1–5–1, 1–6, 1–7, 1–8–0, 1–8–1, 1–8–2, 1–9–0C, 1–9–1C, 1–9–2C, 1–9–3C, 1–9R, 1–10–0, 1–10–1, 1–11, 1–12, 1–14, 1–15, 1–16, 1–17–0R, 1–17–1R, 1–17C, 1–18–0C, 1–18–1C, 1–18R, 1–19, 2–1, 2–2, 2–3, 2–4, 2–5, 3–1–0, 3–1–1, 3–2–0, 3–2–1, 3–2–2, 3–3, 3–4, 3–5, 3–6–0, 3–6–1, 3–6–2, 3–7, 3–8, 4–1–0R, and 4–1–1R of Evangeline Parish; Jefferson Davis Parish; Lafayette Parish; St. Landry Parish; Precincts 9–2, and 9–3 of St. Matrin Parish; and Vermilion Parish.

The precincts enumerated herein are the precincts existing on April 17, 1994 established by the respective parish governing authority and used by the Louisiana Legislature in Act 1 of the Second Extraordinary Session of 1994.

DB: LA SEN 1994 **Congressional District Statistics**
Total Population

Page: 1

| | District Name | Number Members | Total Population | Ideal Population | District Variance | % District Variance |
|---|---|---|---|---|---|---|
| District 1 | | 1 | 602,842 | 602,853 | −11 | 0.00% |
| District 2 | | 1 | 602,877 | 602,853 | 24 | 0.00% |
| District 3 | | 1 | 602,839 | 602,853 | −14 | 0.00% |
| District 4 | | 1 | 602,876 | 602,853 | 23 | 0.00% |
| District 5 | | 1 | 602,933 | 602,853 | 80 | 0.01% |
| District 6 | | 1 | 602,774 | 602,853 | −79 | −0.01% |
| District 7 | | 1 | 602,832 | 602,853 | −21 | 0.00% |

PLANWIDE STATISTICS:
 Range of populations: 602,774 to 602,933
 Ratio range: 1.0003

 Absolute range: −79 to 80
 Absolute overall range: 159

| Relative range: | − 0.01 to 0.01% |
| Relative overall range: | 0.03% |

| Absolute mean deviation: | 36.00 |
| Relative mean deviation: | 0.01% |

DB: LA SEN 1994 **Congressional District Summary**
Total Population and 1994 Registered Voters

Page: 1

| District Name | Total Pop. | Total White | Total Black | Total Reg. Vot. | Total Reg. Wh. | Total Reg. Blk. |
|---|---|---|---|---|---|---|
| District 1 | 602,842 | 515,665 | 72,979 | 332,945 | 296,205 | 32,354 |
| | 100.00% | 85.54% | 12.11% | 100.00% | 88.97% | 9.72% |
| District 2 | 602,877 | 215,630 | 365,874 | 292,713 | 110,239 | 176,552 |
| | 100.00% | 35.77% | 60.69% | 100.00% | 37.66% | 60.32% |
| District 3 | 602,839 | 443,616 | 142,167 | 330,048 | 250,432 | 76,915 |
| | 100.00% | 73.59% | 23.58% | 100.00% | 75.88% | 23.30% |
| District 4 | 602,876 | 397,629 | 195,980 | 299,652 | 214,031 | 82,876 |
| | 100.00% | 65.96% | 32.51% | 100.00% | 71.43% | 27.66% |
| District 5 | 602,933 | 410,725 | 187,223 | 333,182 | 239,419 | 92,379 |
| | 100.00% | 68.12% | 31.05% | 100.00% | 71.86% | 27.73% |
| District 6 | 602,774 | 402,995 | 191,421 | 332,407 | 238,560 | 91,507 |
| | 100.00% | 66.86% | 31.76% | 100.00% | 71.77% | 27.53% |
| District 7 | 602,832 | 452,878 | 143,637 | 336,429 | 258,583 | 76,329 |
| | 100.00% | 75.13% | 23.83% | 100.00% | 76.86% | 22.69% |
| Total | 4,219,973 | 2,839,138 | 1,299,281 | 2,257,376 | 1,607,469 | 628,912 |
| | 100.00% | 67.28% | 30.79% | 100.00% | 71.21% | 27.86% |

DB: LA SEN 1994 **Parish Population by Congressional District**
Total Population and 1994 Registered Voters

Page: 1

| Census Unit | Total Pop. | Total White | Total Black | Total Reg. Vot. | Total Reg. Wh. | Total Reg. Blk. |
|---|---|---|---|---|---|---|
| **District 1** | | | | | | |
| Jefferson Parish | 289,679 | 261,785 | 16,940 | 153,838 | 145,986 | 5,351 |
| Orleans Parish | 39,761 | 36,804 | 2,219 | 26,264 | 24,516 | 1,318 |
| St. Tammany Parish | 144,508 | 126,806 | 15,917 | 82,209 | 73,706 | 7,225 |
| Tangipahoa Parish | 85,709 | 60,601 | 24,527 | 45,988 | 34,015 | 11,831 |
| Washington Parish | 43,185 | 29,669 | 13,376 | 24,646 | 17,982 | 6,629 |
| Total District 1 | 602,842 | 515,665 | 72,979 | 332,945 | 296,205 | 32,354 |
| | | | | | | |
| **District 2** | | | | | | |
| Jefferson Parish | 145,700 | 78,880 | 60,365 | 63,586 | 36,331 | 25,897 |
| Orleans Parish | 457,177 | 136,750 | 305,509 | 229,127 | 73,908 | 150,655 |
| Total District 2 | 602,877 | 215,630 | 365,874 | 292,713 | 110,239 | 176,552 |
| | | | | | | |
| **District 3** | | | | | | |
| Ascension Parish | 21,079 | 10,831 | 10,107 | 13,202 | 7,186 | 5,983 |
| Assumption Parish | 22,753 | 15,273 | 7,349 | 13,823 | 9,411 | 4,410 |
| Iberia Parish | 68,297 | 46,940 | 20,154 | 38,442 | 27,371 | 10,951 |
| Jefferson Parish | 12,927 | 10,505 | 1,737 | 6,940 | 6,011 | 737 |
| Lafourche Parish | 85,860 | 72,371 | 10,703 | 43,794 | 39,464 | 4,243 |
| Plaquemines Parish | 25,575 | 18,522 | 5,944 | 14,589 | 10,454 | 3,137 |
| St. Bernard Parish | 66,631 | 62,199 | 3,111 | 39,195 | 37,308 | 1,754 |

APPENDIX III—Continued

| | | | | | | |
|---|---|---|---|---|---|---|
| St. Charles Parish | 42,437 | 31,638 | 10,253 | 25,533 | 19,315 | 6,184 |
| St. James Parish | 20,879 | 10,484 | 10,357 | 13,676 | 7,093 | 6,567 |
| St. John the Baptist Parish | 39,996 | 25,039 | 14,419 | 22,263 | 13,593 | 8,580 |
| St. Martin Parish | 41,337 | 27,044 | 13,664 | 24,405 | 16,495 | 7,850 |
| St. Mary Parish | 58,086 | 37,688 | 18,337 | 30,986 | 21,270 | 9,508 |
| Terrebonne Parish | 96,982 | 75,082 | 16,032 | 43,200 | 35,461 | 7,011 |
| Total District 3 | 602,839 | 443,616 | 142,167 | 330,048 | 250,432 | 76,915 |
| **District 4** | | | | | | |
| Allen Parish | 7,050 | 6,049 | 972 | 4,794 | 4,114 | 663 |
| Beauregard Parish | 30,083 | 25,242 | 4,489 | 16,481 | 14,255 | 2,125 |
| Bienville Parish | 15,979 | 8,986 | 6,949 | 9,883 | 5,606 | 4,270 |
| Bossier Parish | 86,088 | 67,030 | 17,381 | 39,519 | 33,037 | 6,146 |
| Caddo Parish | 248,253 | 146,580 | 99,511 | 123,515 | 81,992 | 40,524 |
| Claiborne Parish | 17,405 | 9,313 | 8,041 | 9,228 | 5,348 | 3,871 |
| De Soto Parish | 25,346 | 14,003 | 11,141 | 14,403 | 8,429 | 5,489 |
| Natchitoches Parish | 36,689 | 22,357 | 13,779 | 20,534 | 13,096 | 7,146 |
| Red River Parish | 9,387 | 5,752 | 3,589 | 5,997 | 3,848 | 2,144 |
| Sabine Parish | 22,646 | 17,939 | 3,984 | 13,586 | 11,310 | 2,206 |
| Vernon Parish | 61,961 | 45,828 | 12,867 | 20,275 | 17,723 | 2,135 |
| Webster Parish | 41,989 | 28,550 | 13,277 | 21,437 | 15,273 | 6,157 |
| Total District 4 | 602,876 | 397,629 | 195,980 | 299,652 | 214,031 | 82,876 |
| **District 5** | | | | | | |
| Avoyelles Parish | 39,159 | 28,324 | 10,585 | 23,253 | 17,472 | 5,729 |
| Caldwell Parish | 9,810 | 7,970 | 1,760 | 6,397 | 5,357 | 1,031 |
| Catahoula Parish | 11,065 | 8,136 | 2,874 | 7,573 | 5,738 | 1,822 |
| Concordia Parish | 20,828 | 13,164 | 7,596 | 12,063 | 7,868 | 4,184 |
| East Carroll Parish | 9,709 | 3,355 | 6,291 | 5,774 | 2,303 | 3,436 |
| Evangeline Parish | 6,405 | 5,776 | 613 | 4,234 | 3,858 | 371 |
| Franklin Parish | 22,387 | 15,278 | 7,040 | 13,240 | 9,682 | 3,549 |
| Grant Parish | 17,526 | 14,860 | 2,540 | 10,566 | 9,015 | 1,523 |
| Jackson Parish | 15,705 | 11,065 | 4,589 | 9,297 | 6,663 | 2,620 |
| La Salle Parish | 13,662 | 12,271 | 1,257 | 10,185 | 8,748 | 1,324 |
| Lincoln Parish | 41,745 | 24,620 | 16,590 | 20,477 | 12,814 | 7,450 |
| Madison Parish | 12,463 | 4,961 | 7,415 | 7,834 | 3,597 | 4,207 |
| Morehouse Parish | 31,938 | 18,584 | 13,263 | 17,008 | 10,816 | 6,178 |
| Ouachita Parish | 142,191 | 96,870 | 44,096 | 70,344 | 51,233 | 18,890 |
| Rapides Parish | 131,356 | 92,989 | 36,805 | 68,931 | 51,287 | 17,105 |
| Richland Parish | 20,629 | 13,020 | 7,539 | 11,586 | 7,835 | 3,726 |
| Tensas Parish | 7,103 | 3,292 | 3,785 | 4,503 | 2,217 | 2,283 |
| Union Parish | 20,690 | 14,850 | 5,767 | 12,816 | 9,449 | 3,347 |
| West Carroll Parish | 12,093 | 9,997 | 2,020 | 6,808 | 5,809 | 986 |
| Winn Parish | 16,269 | 11,343 | 4,798 | 10,293 | 7,658 | 2,618 |
| Total District 5 | 602,933 | 410,725 | 187,223 | 333,182 | 239,419 | 92,379 |
| **District 6** | | | | | | |
| Ascension Parish | 37,135 | 33,649 | 3,161 | 21,626 | 20,151 | 1,402 |
| East Baton Rouge Parish | 380,105 | 240,614 | 132,328 | 199,491 | 139,379 | 58,868 |
| East Feliciana Parish | 19,211 | 10,022 | 9,083 | 10,844 | 6,129 | 3,804 |
| Iberville Parish | 31,049 | 16,519 | 14,385 | 20,020 | 10,953 | 9,058 |
| Livingston Parish | 70,526 | 66,269 | 3,920 | 40,589 | 38,303 | 2,232 |
| Pointe Coupee Parish | 22,540 | 13,196 | 9,275 | 14,550 | 8,899 | 5,644 |
| St. Helena Parish | 9,874 | 4,725 | 5,127 | 7,834 | 3,831 | 3,996 |
| West Baton Rouge Parish | 19,419 | 12,329 | 6,993 | 11,645 | 7,473 | 4,154 |
| West Feliciana Parish | 12,915 | 5,672 | 7,149 | 5,808 | 3,442 | 2,349 |
| Total District 6 | 602,774 | 402,995 | 191,421 | 332,407 | 238,560 | 91,507 |

**District 7**

| | | | | | | |
|---|---|---|---|---|---|---|
| Acadia Parish | 55,882 | 45,532 | 10,179 | 32,718 | 26,875 | 5,817 |
| Allen Parish | 14,176 | 10,259 | 3,524 | 8,177 | 6,126 | 1,896 |
| Calcasieu Parish | 168,134 | 128,181 | 38,445 | 84,484 | 66,510 | 17,423 |
| Cameron Parish | 9,260 | 8,685 | 503 | 6,125 | 5,776 | 342 |
| Evangeline Parish | 26,869 | 18,629 | 8,088 | 17,546 | 12,336 | 5,193 |
| Jefferson Davis Parish | 30,722 | 24,721 | 5,836 | 17,704 | 14,562 | 3,116 |
| Lafayette Parish | 164,762 | 125,340 | 36,846 | 89,258 | 70,268 | 18,467 |
| St. Landry Parish | 80,331 | 47,532 | 32,392 | 48,634 | 28,873 | 19,638 |
| St. Martin Parish | 2,641 | 1,762 | 868 | 1,498 | 1,021 | 474 |
| Vermilion Parish | 50,055 | 42,237 | 6,956 | 30,285 | 26,236 | 3,963 |
| Total District 7 | 602,832 | 452,878 | 143,637 | 336,429 | 258,583 | 76,329 |